We have four cases on the calendar this morning. Two patent cases, one from the district court and one from the patent office. We have a government employee case from the Merit Systems Protection Board and we have a trademark case from the patent office and that's submitted on the briefs and that will not be argued. The first argued case is Clarilogic v. FormFree Holdings Corporation. So we are ready when you are, Mr. Vercheria. You have a 101 case. I do. May it please the court. My name is Nigam Vercheria and I represent FormFree Holdings Company in this appeal. The patent issue is a 243 patent which dates back to 2008 when the lending industry was in crisis and this patent attempted to provide a solution and it did provide a solution at the time. It received numerous credits and awards and the solution was a tangible transformative method. Counselor, the claims speak to an algorithm engine. Where is that algorithm in the claims? The algorithm engine is, that's a series of inputs into the software. So you're not claiming the rules. We are not claiming the rules. So if you take the rules out, what do you have left? We have the iterative process. But without the rules, the process doesn't work. The process would not work without the rules. But you're not claiming the rules. We are not claiming the rules. So isn't that doesn't even get off the ground. So we see it as it's an iterative process which uses the, which takes in the data, electronically transforms it, and then uses those, the algorithm, whether it's a third party's algorithm or a first party's or their, the own party's data against that algorithm so that we can tell whether the data is certified against that algorithm. So the fact that the algorithm is a third party group. It seems like the patent is attempting to build a financial profile of a potential lender, let's say. Is that? A borrower. A borrower, right. Okay, a borrower. Attempting to build a financial, so that's where you want to get to. That's correct. Take out the algorithm, there is no profile anymore. There wouldn't be, but the whole question is whether the data conforms with the algorithm. No, the question is whether the claims are directed to an abstract idea. If you take out the algorithm, you cannot build this profile, therefore you're left with nothing. That's abstract, isn't it? Well, I would say that it's, it's like deer without, when you take the, the mathematical formula, all you are left with is a generic method for curing rubber. I would say it's similar to Bascom in that. But it was physically transformative, wasn't it? That's different than what you have here. In here, we have some physical transformation in that the data is, it's not physically transformative in that we, but we do get a tangible report at the end. You get data in and data out. Together with the report showing certification against the standards. And so I think it's more like deer. It's, it's similar to, well, it has a lot of similarities to Amdocs. The case where, where we're taking data from multiple, multiple sources, putting them together and creating a billing report. Well, could we, are you familiar with electric power group? Yes. So in that opinion, the court tried to draw from multiple cases from the court and come up with some principles. And it explained how collecting information, that's just abstract. It's an abstract idea. Then it went further and said, taking that collected information and then analyzing it by a process that people go through in their minds and doing that on a computer is also just an abstract idea. And then it further said, after going through that analysis of the information and displaying it is still without more, just abstract. And so when I look at your claims, I feel like, okay, we're collecting financial information about an individual. We're applying some unstated rules to review that information to come and display a result. This is all computer implemented, indicating whether, whether there's a risk problem with this financial information. That to me, you know, you can explain it to me why I'm wrong, but that to me follows the profile of what we explained in electric power group falls within an abstract idea. What it looks like is we're doing an abstract process on a computer as opposed to say, doing some kind of specific improvement to a computer that improves the computer as a tool. Now, having said all that setup, please explain to me where I'm off. So I think a couple of things here. So with electric power grid, the whole idea was just collecting and analyzing information. Here we are not doing that. What we're doing here is we are taking information that comes into the system. We're using that algorithm, whatever it may, that emphasizes a pattern of risk. Specifically, we're not looking at anything other than a pattern of risk. And we're marking certain exceptions. We're not saying whether those exceptions are per se more risky or less risky. And then we're having that same algorithm look at that data and then present that problematic, you know, report to a lender so that a lender knows, does this data conform to the standards that I have? And I think analyzing it and presenting it to power in the power context. Okay. I'm sorry. I didn't quite understand the distinction there because if I could just summarize your description of your claimed invention, it's collecting information, analyzing that information to see if there's any trouble spots, and then presenting the trouble spots. First, it's collecting additional information from other sources and putting that together with the exceptions, as we call them, and then saying whether they're valid exceptions, saying are these exceptions that we should be concerned about or not concerned about? That's kind of like an analysis, right, of information? Yeah. I would look at it as more confirmation analysis. Okay. Confirmation of information. Confirmation, and then presenting that in a way that a third party can act on this certified report. So I think it's a little different than simply just gathering information, collecting it, and then... And analyzing it, and then displaying it. Your invention's different from that. I think a couple of things that are key is this can't really be done for humans. Humans can't necessarily do this process. For one, we've gotten two big advantages out of this. One is it's faster in that we can collect information from multiple sources and put them together in this report to say whether the data conforms with the standards. And second, we've taken out the human error part in that one of the biggest problems with the technology prior to this was humans introducing fraud into the system. Are you familiar with the invention in AliceCorp? Yeah. The Supreme Court decision? Yes. The Supreme Court rejected the idea that just being able to do something faster because it's computer implemented is going to save the day, right? There were thousands of currency exchanges going on on that system, and that wasn't persuasive. And so we're controlled by that. So I think here it's a combination of the iterative process, which was not in the Alice system, and the gathering from multiple sources, which also was not in the Alice system, and putting that all together faster. Faster is just one advantage of the system. It's not the advantage. It's the fact that you can actually do all of this electronically and minimizing human interaction, human error into the system. That's because computers work so fast. Well, and it's also part of the reason is that putting this algorithm on the system and then having the system gather the information, that's one of the big reasons. Because data collection is not new to the financial industry. It's been there since the 60s. We're not claiming that collecting the data and putting it in a form is new. We wouldn't consider any just taking the data and presenting it. We would not think that's new. It's the whole idea of taking the algorithm, putting it into a piece of software. You're talking about what's new. Novelty isn't the issue here. Abstractness is the issue. Yeah, so I think that the abstraction or the lack of abstraction is seen in that we're doing these concrete steps of putting the algorithm into the software, having the software confirm the exceptions, and then generating a report specifically telling us whether we conform or we don't conform with the algorithm, which is different than just the pure collection of data. We're into your rebuttal. You can continue to use your time or save it. I will save it. Arthur Wellman. May it please the court, Arthur Wellman on behalf of the appellees and plaintiff below Clara Logic. I want to clean up a couple of points if I may. One is that in the reply brief, form free alleged that we had misconstrued their brief and referred to our unsuccessful motion to strike their evidence. As the court is probably aware, there wasn't an unsuccessful motion to strike the evidence because we made no motion to strike the evidence. Why don't we get into the merits of the decision? Certainly. Are these claims abstract or not? They're absolutely abstract, your honors. And your honors, I think, correctly focused on the relevant authority. And I'm loathe to characterize to this court its own decisions. But for example, this court's decision in Intellectual Ventures rejected claims that are analyzing, as Judge Chen brought up, analyzing data and then going and getting more data and going and getting more data. That doesn't take it out of the realm of an abstract idea, nor is it, I would suggest, particularly inventive as to whether a human can practice the claims. Let's say I'm a lender who says, I don't want to lend to someone who's had three insufficient fund instances in the last six months. I pick up their bank statement. I look at it. The algorithm engine in my head says there's two. I pick up the next month and I see one. The algorithm engine in my head says that's three. Done. It reports to me, don't lend to that person. That's three insufficient fund instances. That's the height of abstraction. Going beyond that, your honors, I would suggest these claims are not only preemptive. They're co-optive. Humans have to be What's the difference between those two? Preemptive, your honor, meaning that if someone comes up with a new method in the future for analyzing the data, a new algorithm, let's say three insufficient fund instances in six months or five in one year, this method would preclude them from implementing that on a computer and that would preempt their idea, which is the issue of preemption. Co-optive is looking backwards, your honor, and that is it took my proprietary algorithm. It co-opted it. You have to have already had the algorithm because, as the court has noted, the patent doesn't supply any algorithm, unlike in Deere. The patent says put in whatever it is that you think is a good idea to use to analyze their creditworthiness and then the computer will run and chew through that data and tell you, based on the criteria you provided, whether or not that person is a good credit risk. I think to suggest to this court or any other that it's somehow inventive or non-abstract to tell a company that's already gathering data by computer, hey, you should use your own method to analyze that data is not very innovative and is abstract. It looks like a data processing, data analysis invention. Is it your point of view that all data processing inventions are abstract? They may not all be abstract, so they may not fail at phase one, but, for example, in the Enfish case, that's a data processing software where a novel data structure was created and claimed, as this court has, I think, appropriately focused on, not just what you claim to have invented, but what is in the claim, what is recited there. Is it specifically claimed in a manner that is not preemptive? In that case, the court said no. The court said yes, it's specifically in a claim that we're not as worried about preemption, and it's innovative because you created this self-referential data structure, which could then be used by a computer, and that's what you're claiming. You're not claiming all ways of processing data, and you're not claiming all ways of processing data faster. You're instead claiming this novel structure that you created that happens to enable that, but the claim is to the novel structure, so I'm not saying that all data processing patents would necessarily fail this court's jurisprudence and the court's jurisprudence in Alice. I hope this court doesn't have any issue with the admissibility of the evidence. There was an argument below that Mr. Acharya's citation to portions of his expert testimony saying, our expert said there was no other system that could do this. We came back in opposition and said the expert didn't say that, and in reply, they said it was a scrivener's error, which notably they had repeated, but I want the court to realize that the portion of the record that they're now citing is Mr. Acharya's argument to the Patent and Trademark Office, which is also obviously an admissible hearsay. I don't think it's particularly controversial that you need admissible evidence to oppose a motion for summary judgment, and that it was their burden below to show once an objection was made to it, which we did reject, to show that the proffered evidence was admissible, which they didn't, and their burden on appeal to show that had the court rejected that evidence. I think the issue of real interest here is a one-on-one issue. Thank you, Your Honor. There were a couple of points I wanted to make on that issue, just following up on things that this court has already raised. As Judge Lurie noted, without the rules, there's nothing. No algorithm is provided, and I also wanted to point out that their transformative step, and far from dear, recall that it was construed at their request. There's electronic data that's gathered. A computer reads it and transforms the data into electronic data that a computer can read, which I would suggest, Your Honors, is non-transformative, or at least extremely subtle as to how that transforms anything. As Judge Lurie said, data comes in and data goes out. That data was readable when it came in by a computer because a computer read it. We know that. It's also readable by a computer when it comes out. So I don't see a transformation, and certainly not a patentable transformation that would be an abstract idea, and this court, as you have all analyzed, has said repeatedly that the analysis of data without more and reporting on that data is an abstract idea. I don't see anything here that would transform that. And with that, given this court's questions, I would submit, if the court has no further questions, I would thank the court and submit. The claim had decided some 15-step sequence of operations that the processor would undertake in order to assess whether there's financial risk in the data. Would that be a patent-eligible invention? I don't want to quizzle on the court's question, but I would suggest it depends on what the steps are. The steps here I would submit that were claimed were parsed down to a very minute detail. They have a step that says gather the data, then check the data, then apply the algorithm, then gather more data. And so you can break what is an abstract process and is the normal operation of any computer, get data, read, write, compare, Boolean, write again. You can break that down into a bunch of steps. And so I don't think it's the number of steps, per se, that confer patentability, but rather the substance in those steps and what it is that those steps bring to the table. And again, as one example in EnFISH, if one of those steps is creating a heretofore unknown data structure and then utilizing that to analyze the data, I think that would be patentable. And this court has said it was patentable. So I don't think it's per se, Your Honors, the number of the steps. Thank you, Counsel. Thank you very much. Mr. Echaria has three plus minutes for rebuttal if he needs it. Your Honors, I submit that this case is different than just a mere analysis of prior of data in that the cases where data was found to, sorry, where steps were found to be abstract and not meeting step two. So Counsel, do you agree that the inquiry here is where the claims are directed to an abstract idea? I do agree with that. So when we look at the claims and we say, what are the claims directed to? What do they embrace? What are they saying? And we know there's no algorithm involved. The claims do not, are not directed to an algorithm. There's no rules. So are we just left with information? Well, I think this is similar to the Macro case in that where rules to... Well, in Macro, there were rules and the claims did address particular rules. So here, our rules are for the pattern of risk, as their rules were for the pattern of sound. Your rules are the algorithm. The algorithm engine finds a pattern of risk in the... Right. Your rules are to the algorithm, correct? Without the algorithm, there is no analysis, there is no transformation of data, there is no final report. Correct. So if the claims are not directed to an algorithm, then all we're left with is data, information. Well, but so we're claiming, the fact that these are old, these are prior, that these are someone else's algorithms, I think doesn't change the abstract question. I think it's just like with Macro, the pattern of sound... I could agree with you if the claims at least identified the algorithm or the steps, the rules that are followed, but we don't have that. So the pattern, it sets out to build a financial picture of a borrower, correct? Of a borrower. It is rendered abstract because the claims can't do that, because you don't have any rules. You have no way of analyzing the data. So it's abstract. So I would say that the rules here are the rules governing pattern of risk, which are well known in the industry, and we wouldn't want to claim those because each institute has its own proprietary set of rules. And so we're saying, let's help those institutes by putting your rules into a piece of software, having that piece of software transform the data you're coming at. So it's computerizing of prior practice? That's your invention? And adding and transforming it, and then ultimately allowing a report to say whether the data is certified against that algorithm, which is what that report would be included when a loan is sold or a loan is bought. Because one of the big problems with the lending industry was that nobody would know whether the algorithm was complied with. It would just have human errors, and it would have various problems with it. And so here, we're actually saying, put it on a computer, which is, we think, not abstract. Have it checked, collect additional data, and then prepare the report that we'll add to the backup. We'll prepare the report that says the data is certified. Thank you, counsel. As you can see, your light is on. Do you have a case under judgment?